UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA and
STATE OF MICHIGAN, ex rel,
ASHWANI SHEORAN, RPh,

      Plaintiff-Relator,

-vs-

WAL-MART STORES EAST, LP, d/b/a
WALMART, a foreign corporation,
DEFENDANT TOI WALKER, DOUG HENGER,
ALFRED RODRIGUEZ,
RICHARD LOCKARD, M.D.,
NAVEED MAHFOOZ, M.D., and
TAREK EZZEDDINE, M.D.,

Jointly and Severally,

      Defendants.

_____/

Case No. 13-10568
Hon. John Corbett O'Meara
Magistrate Judge Michael Hluchaniuk

**MATTER FILED IN CAMERA
AND UNDER SEAL**

HERTZ SCHRAM PC
By:    Patricia A. Stamler (P35905)
Attorney for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302-0183
(248) 335-5000

_____/

## SEALED COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (QUI TAM), THE FRAUD ENFORCEMENT RECOVERY ACT OF 2009 CIVIL MONETARY PENALTIES AND THE MEDICAID FALSE CLAIMS ACT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff-Relator Ashwani Sheoran (hereafter "Relator"),  for himself and

on behalf of the United States of America and the State of Michigan, by and through his

attorneys, HERTZ SCHRAM PC, and hereby files his Complaint under the False Claims Act

("FCA"), 31 U.S.C. § 3729, et seq., the Fraud Enforcement Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act, MCL 400.601 et seq. ("Acts") and states as follows:

## JURISDICTION AND VENUE

1.       This action arises under 31 U.S.C. § 3729 et seq., the False Claims Act ("FCA"); 31 U.S.C. §§ 3729-3733, the Fraud Enforcement Recovery Act of 2009 ("FERA"); 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, the Civil Monetary Penalties Law;  MCLA 400.604 et seq., the Michigan Medicaid False Claims Act (the "Acts"), to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of the Defendants' submission of false claims to the United States and the State of Michigan governments through the federal health care programs, including Medicare and Medicaid.

2.       31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under such Act.  In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.  Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) or any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732.

3.       Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the Act which provides that "any action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides,

transacts business, or in which any act prescribed by § 3729 occurred." Some of the acts which are the subject of this Complaint occurred in the cities of Taylor, Caro, Bad Axe, Fenton, Grand Blanc, Saginaw and Sandusky in the State of Michigan, within this judicial district.

4.     Under the False Claims Act, this Complaint is to be filed *in-camera* and remain under seal for a period of at least 60 days and under the Michigan Medicaid False Claims Act the Complaint is to be filed *in-camera* and remain under seal for a period of at least 90 days and shall not be served on defendants until the Court so orders. The federal government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and the state government may elect to intervene and proceed with the action within 90 days after it receives both the Complaint and the material evidence.

5.     As required under § 3730(a)(2) of the FCA, Relator provided to the Attorney General of the United States, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint. Relator also provided the Attorney General of the State of Michigan a copy of their disclosures.

6.     Relator is the original source of the information of the allegations contained in this Complaint.

7.     This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL").

8.     This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, which provisions are known as the CMPL.

## PARTIES

9.     Relator Ashwani Sheoran is a licensed pharmacist in Michigan and Ohio and he is licensed to dispense controlled substances in the State of Michigan, and for all times relevant to this Complaint is a citizen of Canada and a resident of the State of Michigan, United States of America and brings this action on behalf of the United States of America and the State of Michigan.

10.     Defendant WAL-MART STORES EAST, LP, d/b/a WALMART, a foreign corporation (hereafter "WALMART") for all times relevant to this Complaint is a Delaware corporation doing business throughout the United States including the State of Michigan.

11.     Defendant WALKER (hereafter "WALKER") is, for all times relevant to this matter, the Health and Wellness Market Director, Region 19, Michigan Market Great Lakes Division at Defendant WALMART.

12.     Defendant DOUG HENGER (hereafter "HENGER") is, for all times relevant to this matter, the Regional Director Health and Wellness, Region 19 – Michigan at Defendant WALMART.

13.     Defendant ALFRED RODRIGUEZ (hereafter "RODRIGUEZ") is, for all times relevant to this matter, the Human Resources Director, Health and Wellness for Defendant WALMART.

14.     Defendant RICHARD LOCKARD, M.D. (hereafter "LOCKARD"), is a licensed medical doctor in the State of Michigan.

15.     Defendant NAVEED MAHFOOZ, M.D. (hereafter "MAHFOOZ"), is a licensed medical doctor in the State of Michigan.

4

16.     Defendant TAREK EZZEDDINE, M.D. (hereafter "EZZEDDINE"), is a licensed medical doctor in the State of Michigan.

## GENERAL ALLEGATIONS

17.     Medicare and Medicaid are separate federally funded health care programs established by Congress in 1965 as Title XVIII and XIX, respectively, of the Social Security Act. 42 U.S.C. § 1395, et seq., and §1396, et seq.

18.     Medicare is administered by the United States Department of Health and Human Services (DHHS) and two of its agencies, the Centers for Medicare and Medicaid Services (CMS).

19.     Wisconsin Physician Services Insurance Corp is the administrative contractor for Medicare Part B for the State of Michigan and TrustSolutions LLC is the contractor utilized to safeguard the program and the Social Security Administration (SSA).

20.     Medicare is available to individuals aged 65 and older, individuals younger than 65 who qualify for Social Security disability benefits and have been disabled for two years or more, and individuals suffering from End Stage Renal Disease or Lou Gehrig's disease. Medicare is an insurance program comprised of four parts, including: a) Medicare Part B, or "Medical Insurance," which is supplemental medical insurance that provides coverage for outpatient hospital visits, physician services, durable medical equipment (DME), diagnostic tests and prescription drugs administered by a physician.  The program is a voluntary program that requires a beneficiary to pay monthly premiums along with a deductible and a 20% co-insurance payment for most services; and b) Medicare Part C, or the Medicare Advantage Program, which provides the benefits of Parts A and B through private managed care plans.

21.    Medicaid is a separate federally funded health care program established by Congress in 1965 as Title XIX of the Social Security Act. 42 U.S.C. §1396, et seq.

22.    Medicaid is jointly funded by the federal and state governments to supply medical assistance to low-income individuals and families.

23.    Medicaid programs are established by each state pursuant to guidelines provided by the federal government. Although each state administers its own Medicaid program, the federal Centers for Medicaid and State Operations, a division of CMS, monitors each state program.

24.    States must provide Medicaid to the "categorically needy," including beneficiaries of Aid for Dependent Children (AFDC), recipients of Supplemental Security Income (SSI), low-income pregnant women, and children with a family income at, or slightly above, the federally-defined poverty level. Some states, including Michigan, also provide Medicaid benefits to the "medically needy," that may include students, individuals aged 65 or older, blind persons, and disabled persons.

25.    Federal guidelines require every state Medicaid program to provide the following benefits, among others: (a) inpatient hospital services, (b) outpatient hospital services, (c) laboratory and x-ray services, (d) physicians' services, (e) home health services, and (f) certain ambulatory services.  42 C.F.R. 440.210-220.

26.    Defendant WALMART's world headquarters is located in Bentonville, Arkansas and its stock is publicly traded on the New York Stock Exchange.

27.    According to its website, Defendant WAMART is "the world's largest retail company." http://corporate.WALMART.com/our-story/ WALMART is often listed as the largest company in the world, of any kind. http://corporate.WALMART.com/our-story/.

28.     Defendant WALMART's customer and members exceed more than 200 million per week. http://corporate.WALMART.com/our-story/ WALMART's sales for fiscal year 2012 were approximately $444 billion. http://corporate.WALMART.com/our-story/.

29.     As of November 27, 2012, WALMART U.S. has 3,971 retail units (excluding Sam's Club). http://corporate.WALMART.com/our-story/

30.     Defendant WALMART operates more than 10,000 retail units in 27 countries.

31.     Defendant WALMART Supercenters began in 1988 and today there are more than 3,000 Supercenters in the U.S.   Most of the Supercenters are open 24 hours, and may include, among other things, pharmacies.

32.     Defendant WALMART Express stores were created in 2011 "for urban and rural areas that lack access to larger stores."   These stores offer, among other things, pharmacy services.

33.     Sam's Clubs- provide merchandise for sale in bulk. Most of these clubs have specialty services including pharmacies.

34.     Defendant LOCKARD's license to practice medicine was placed on probation on December 16, 2011.

35.     Defendant LOCKARD holds himself out as family medicine practitioner and he maintains four medical offices located at 1) 40 N Main St., Elkton, MI 48731; 2) Huron Medical Center, 1100 S. Van Dyke Road., Bad Axe, MI 48413; 3) 2269 E. Main St., Ubly, MI 48475 and 4) 6 N. Main St., Elkton, MI 48731.

36.     Defendant MAHFOOZ, is board certified in internal medicine and for all times relevant to this Complaint his office is located at Caro Health Plaza, 1525 W Caro Road Suite A, Caro, MI 48723.

37.     Defendant EZZEDDINE is a family practice doctor and for all times relevant to this Complaint, his office is located at 1525 W Caro Road Suite A, Caro, MI 48723 (which is the same location as Defendant MAHFOOZ's office).

38.     On or about April 21, 2012, Defendant WALMART hired Relator to work as a full-time floater pharmacist in Michigan.

39.     Relator commenced working for Defendant WALLMART as a floater pharmacist on or about May 1, 2012.

40.     During the time period when Relator was a floater for Defendant WALMART, was primarily assigned to perform floater pharmacist services in Defendant WALKER's region, and thus Defendant WALKER was his direct supervisor when Relator worked in her region.

41.     During his tenure with WALMART, Relator often worked 70 hours per week.

42.     Defendant WALKER's office is, for all times relevant to this Complaint, located in Grand Blanc, Michigan.

43.     On or about July 14, 2012, Relator was working at Defendant WALMART's Caro, Michigan location at store # 1798.

44.     On or about July 14, 2012, during his shift, Relator observed a large number of faxed prescriptions for controlled substances schedules III-V sent from the offices of Defendants MAHFOOZ and EZZEDDINE.   Relator further observed that these faxed prescriptions for schedules III-V controlled substances were computer generated bearing only the physicians' electronic signature.

45.     The faxed controlled substances prescriptions bearing electronic signatures of Defendants MAHFOOZ and EZZEDDINE did not meet the legal requirements necessary for a pharmacist to fill them.

8

46.     On or about July 14, 2012, Relator contacted Defendant WALKER and informed her that the Caro store was receiving numerous faxed prescriptions for controlled substances bearing only the physicians' electronic signatures.

47.     On or about July 14, 2012, Relator informed Defendant WALKER that these controlled substances prescriptions did not meet legal requirements.

48.     On or about July 14, 2012, Relator also told Defendant WALKER that the Caro store was receiving about 50 to 60 of these illegal prescriptions per day.

49.     After observing these illegal controlled substances prescriptions, Relator reviewed certain "patient profiles" maintained in the WALMART computer system at the Caro store.

50.     On or about July 14, 2012, Relator found that his review of the "patient profiles" revealed that more than 500 illegal controlled substances prescriptions were filled within the time period of approximately 30 days, at the Caro store.  Relator shared his observations with Defendant WALKER.

51.     On or about July 14, 2012, Relator also observed that illegal controlled substances prescriptions were being filled from at least 2007 to July 2012.  Relator shared his observations with Defendant WALKER.

52.     On or about July 14, 2012, Defendant WALKER asked Relator how he determined the length of time for the conduct he described to her.  Relator told Defendant WALKER that one of the pharmacy technicians, Jenny, told him that the Caro store had received faxed prescriptions for schedules III-V controlled substances that were computer generated bearing the local physicians' electronic signatures and that Jenny showed him a Log Book located in the Pharmacy which contained such records dating back at least five years.

53.     On or about July 14, 2012, Relator told Defendant WALKER that he was concerned that many of the illegal prescriptions for controlled substances were written for excessively large quantities of pills and that if filled and taken as prescribed the consumer would be grievously harmed.

54.     On or about July 14, 2012, Relator expressed concerns to Defendant WALKER that because these prescriptions were not meeting legal requirements, that they must not be filled and that the monies received for filling prior illegal prescriptions needed to be returned to the government.

55.     On or about July 14, 2012, Relator advised Defendant WALKER that the Drug Enforcement Agency (DEA) should be notified of this systemic problem of faxed prescriptions for controlled substances schedules III-V from the offices bearing the electronic signatures of Defendants MAHFOOZ and EZZEDDINE.

56.     On or about July 14, 2012, Defendant WALKER responded to Relator that she was aware of this problem, that she would take care of the problem and that she would follow-up with the Pharmacy Manager for the Caro location, Ms. Carrie Martindale.

57.     The law prohibits the dispensing of controlled substances found on Schedules III-V based on a faxed prescription bearing a physician's electronic signature.

58.     The law mandates that faxed prescriptions for controlled substances must bear the physician's manually signed signature as follows:

> Schedules III-V controlled Substances
> A pharmacist may dispense directly a controlled substance listed in Schedule III, IV or V only pursuant to either a paper prescription signed by a practitioner, a facsimile of a signed paper prescription transmitted by the practitioner or the practitioner's agent to the pharmacy, an electronic prescription that meets the DEA's requirements for such prescriptions, or a call-in as indicated below (see Telephone Authorization for Schedules III-V Controlled Substances).

> Facsimile Prescriptions for Schedules III-V Controlled Substances
>
> Prescriptions for schedules III-V controlled substances may be transmitted by facsimile from the practitioner or the practitioner's agent to the dispensing pharmacy.  The facsimile is considered to be equivalent to an original prescription as long as the practitioner has manually signed the prescription.

(Excerpts of DEA Pharmacist Manual pp.1, 35-37).

59.     On or about July 22, 2012, Relator contacted the Taylor police department and filed a complaint regarding the illegal controlled substances prescriptions.

60.     On or about July 22, 2012, Relator provided a written statement to Taylor police officers Hensen, Badge # 174, Patterson, Badge # 145 and Marimpietri Badge # 190. The police report has the assigned number of 12-23081.

61.     On or about July 23, 2012, Relator forwarded an e-mail and an internal Incident Report dated July 22, 2012, to Defendant WALKER regarding the illegal controlled substances prescriptions and stated that he had filed a complaint with the Taylor police department.

62.     On or about July 25, 2012, Relator met with Defendant WALKER at the WALMART Fenton, Michigan store # 2693.

63.     On or about July 25, 2012, Relator began discussing his July 23, 2012 e-mail with Defendant WALKER. Defendant WALKER claimed that she had not received his e-mail and asked him to resend it to her. Relator complied with her request and resent his July 23, 2012, e-mail.

64.     Upon reviewing the Incident Report and the July 23, 2012, e-mail, Defendant WALKER learned that Relator had filed a complaint with the Taylor police department.

65.     On or about July 25, 2012 Defendant WALKER became angry and told Relator that if he ever called the police again or if he contacted the DEA he would be terminated immediately.

66.     On or about July 25, 2012, during the meeting with Defendant WALKER, Relator reiterated his concerns about the illegal prescriptions received and filled in the Caro WALMART store.

67.     On or about July 25, 2012, Defendant WALKER told Relator that she had disclosed his report regarding the faxed controlled substances prescriptions in the Caro store to the Pharmacy Manager, Carrie Martindale.  She further stated that she intended to follow-up with WALMART's Regulatory Affairs.  Defendant WALKER told Relator that she would not share the outcome of her contact with Regulatory Affairs' review of the matter.  She also told Relator that she would not disclose whether WALMART would report the incidents to the DEA.

68.     On or about July 25, 2012, Defendant WALKER then admonished Relator stating that he should just do his work and the he must not discuss the prescription issue with anyone else.

69.     On or about July 25, 2012, shortly after his meeting with Defendant WALKER, Relator observed a female customer approach the Pharmacy window in the Fenton, Michigan WALMART store, Store # 2693.

70.      On or about the end of July 2012, the Fenton customer presented a prescription for 100 Vicodin for every ten days.  The customer was approximately 70 years old and it appeared to Relator that the customer and the pharmacy technician, a Caucasian female about 25 years old, knew each other well.  Upon reviewing this customer's prescription, Relator accessed her "Patient Profile" on Defendant WALMART's computer system and found a record of

multiple prescriptions for controlled substances being filled and refilled prior to the allowable refill dates (e.g. filling 100 Vicodin every ten to 12 days.)  Subsequent to his review of the customer's Patient Profile, Relator declined to fill the customer's prescription.

71.    On or about July 26, 2012, Relator contacted Defendant WALKER and informed her about the incident in Fenton on or about July 25, 2012, as detailed above.

72.    In response to Relator's report regarding this controlled substance prescription Defendant WALKER stated that the pharmacy technician at the Fenton store had reported that Relator had been rude to a customer when he declined to release the controlled substances prescription for a man she claimed was her husband.  Relator explained that the person seeking to obtain the prescription allegedly for her husband, she had not been able to verify her "husband's" address or his date of birth.  Relator advised the woman that pursuant to HIPAA he was not able to discuss a person's prescription without a note from the patient.  Relator further explained to Defendant WALKER that the pharmacy technician was, however, providing this type of information to this customer.

73.    Relator then reiterated his concerns about the customer with multiple Vicodin prescriptions at the Fenton store.

74.    Defendant WALKER stated that she would follow-up on the issue and get back to him.  Defendant WALKER told Relator that she was very happy with his performance, his willingness to provide coverage seven days a week at various locations and that he had received no customer complaints.

75.    On or about July 31, 2012, Relator was assigned to work in Bad Axe, Michigan, Defendant WALMART store # 1592.

76. On or about July 31, 2012, upon arriving to the pharmacy, prior to 8 a.m., Relator observed a line of customers (numbering around ten) waiting for the pharmacy to open.

77. All of these customers were patients of Defendant LOCKARD.

78. On or about July 31, 2012, these customers presented controlled substances prescriptions for high doses (ranging from 450, 600, 800 and 1200) of methadone, morphine sulfate and/or oxycodone.

79. On or about July 31, 2012, Relator contacted Defendant WALKER and informed her customers at the Bad Axe stores were presenting controlled substances prescriptions for high doses (ranging from 450, 600, 800 and 1200 tablets) of methadone, morphine sulfate and/or oxycodone.

80. On or about August 2, 2012, Relator met with Defendant WALKER and expressed his concerns regarding the controlled substances prescriptions he observed during his assignment at Bad Axe on July 31, 2012, and his observations at other stores, including the Sandusky and Caro stores.

81. On or about August 2, 2012, Relator told Defendant WALKER that the amount of controlled substances drugs prescribed in the prescriptions were excessively high, and were indicative of illegal diversion activities.

82. On or about August 2, 2012, despite the serious concerns Relator raised with Defendant WALKER regarding these controlled substances prescriptions, she directed Relator to fill these controlled substances prescriptions because they yielded revenue and made the Bad Axe store profitable.

83.     On or about August 2, 2012, Defendant WALKER stated that if these prescriptions were not filled, the Bad Axe store, located in a rural area, would only be filling 50 prescriptions per day.

84.     On or about August 2, 2012, Relator responded to Defendant WALKER that filling these prescriptions is against the law, that it hurts patients and the community.

85.     On or about August 2, 2012, Defendant WALKER instructed Relator to keep quiet regarding his observations regarding the controlled substances prescriptions.

86.     On or about August 2, 2012, Defendant WALKER instructed Relator not to talk to anyone about his observations and if he continued to talk about it, he should be prepared for the consequences.  She stated the store in Bad Axe was short-staffed and that once she fully staffed the store she would no longer assign him there.

87.     On or about August 3, 2012, Relator observed a customer, who appeared to be approximately 50 years old and of Hispanic descent, in Defendant WALMART's Sandusky, Michigan store, attempting to fill Vicodin prescription for 500 tablets like WALMART had filled similar prescriptions on several prior occasions.

88.     On or about August 3, 2012, Relator reported the Sandusky store incident referenced in paragraph 87 above, to his supervisor Defendant WALKER.

89.     On or about August 4, 2012, Relator was assigned to work at Store #2912, in Taylor, Michigan.

90.     On or about August 4, 2012, Relator received a call from a pharmacist named Sue at Sax Pharmacy, located at 22525 Wick, Taylor, MI 48180.  The Sax Pharmacy pharmacist alerted Relator to the fact that William Andrew, a customer, allegedly had stolen a prescription

pad from Henry Ford Hospital, that he was signing stolen prescriptions, and that the bogus prescriptions were for Oxycodone, Vicodin, Opana, Xanax and other controlled substances.

91.     On or about August 4, 2012, after receiving this phone call, Relator contacted, via e-mail, Defendant WALKER and Ms. Kelly Henning, supervisor for the Taylor store seeking direction from them regarding what to do about this situation.

92.     Defendant WALKER did not respond to Relator's email on this issue.

93.     On or about August 6, 2012, Ms. Henning responded to Relator that he should report the matter to WALMART's Regulatory Affairs.

94.     On or about August 6, 2012, Relator called Regulatory Affairs within Defendant WALMART and reported his observations at the Taylor WALMART pharmacy as described in the preceding paragraph.

95.     On or about August 6, 2012, Relator recorded notes of his phone call to Regulatory Affairs, consistent with WALMART's policies.

96.     On or about August 6, 2012, Relator was assigned to work in WALMART's Bad Axe, Michigan store.

97.     On or about August 6, 2012, Relator again observed large numbers of controlled substances prescriptions from Defendant LOCKARD's office being presented to the pharmacy.

98.     On or about August 6, 2012, Relator contacted his supervisor, Defendant WALKER, and reported his observations pertaining to the high number of Defendant LOCKARD patients presenting prescriptions for controlled substances.

99.     On or about August 6, 2012, in response to Relator's report, Defendant WALKER informed him that she was looking into the issue, instructed him to fill these prescriptions and told him that if he did not fill them another pharmacy would fill them.

100.    Relator declined to fill these controlled substances prescriptions.

101.    On or about August 9, 2012, Relator was assigned to work in Defendant WALMART's Caro, Michigan store, #1798.

102.    On or about August 9, 2012, Relator observed that the pharmacy was receiving a large number of faxed prescriptions for controlled substances bearing digital signatures.

103.    On August 9, 2012, Relator contacted his supervisor, Defendant WALKER, and reported his observations regarding the faxed controlled substances prescriptions bearing digital signatures.

104.    On or about August 9, 2012, Relator also reported that the pharmacy technicians were protesting Relator's refusal to fill these prescriptions.

105.    On or about August 9, 2012, Relator also told Defendant WALKER that the pharmacy technicians were resisting his request to verify these prescriptions with the doctor who allegedly signed them and thus he had to personally contact the three doctors who had allegedly signed these prescriptions.

106.    On or about August 9, 2012, Relator contacted Defendants MAHFOOZ and EZZEDDINE.  These physicians and their staff confirmed that they had faxed these prescriptions to the pharmacy, and they confirmed that the prescriptions had electronic signatures.  Relator informed these physicians' offices that faxing controlled substances prescriptions with electronic signatures is against the law and referred them to the Controlled Substances Act and the DEA manual.

107.    On or about August 9, 2012, Relator observed that only two of the many controlled substances prescriptions that he previously reviewed were resent via fax with the required manual signatures on them.

108.    On or about August 17, 2012, Relator was assigned to work in Defendant WALMART's Saginaw, Michigan, Store #5097.

109.    On or about August 17, 2012, during his assignment in the Saginaw store location, Relator observed that the pharmacy was receiving a large number of faxed prescriptions for controlled substances that had electronic signatures on them.

110.    On or about August 17, 2012, Relator attempted to reach the physician whose name appeared on these prescriptions to advise him that prescriptions needed a manual signature.

111.    On or about August 17, 2012, Relator was not able to reach the alleged prescribing physician, as he was not in the office on the date these prescriptions were being faxed over.

112.    On or about August 17, 2012, Relator contacted Defendant WALKER reported his observations of the large number of faxed controlled substances prescriptions bearing electronic signatures in the Saginaw store.  He also told Defendant WALKER that the physician whose name appeared on these controlled substances prescriptions was not in the office.

113.    On or about August 20, 2012, Relator was working at Defendant WALMART's Sandusky, Michigan store, #3632, where he observed faxed prescriptions for controlled substances bearing only the physicians' electronic signatures.

114.    On or about August 20, 2012, Relator observed the pharmacy's failure to obtain proper physician verification for prescriptions containing a high quantity of controlled substances, failing to verify out-of-the-area prescriptions for controlled substances and allowing the unauthorized entry of non-pharmacy Defendant WALMART employees into the Pharmacy.

115.    On or about August 20, 2012, Relator reported his observations and concerns related to the Sandusky pharmacy to Defendant WALKER.

18

116.    On or about August 20, 2012, Defendant WALKER responded to Relator's report by telling him that "back off now," that he should not be discussing controlled substances and to let the store operate as it has been operating.

117.    On or about August 20, 2012, Defendant WALKER threatened Relator with termination.

118.    On or about August 22, 2012 and August 24, 2012, Relator requested to be removed as a floater pharmacist and to be assigned to a particular pharmacy that was not engaging in misconduct involving controlled substances prescriptions.

119.    On or about August 24, 2012, Relator contacted Defendant WALMART's Executive Open Door Services to lodge his concerns regarding illegal controlled substances prescriptions.   Relator also sent an e-mails to upper management of Defendant WALMART including Mike Duke, Paresh Patel and Robert Walton and Defendants WALKER and HENGER.

120.    On or about August 24, 2012, Relator contacted Mr. Lionel Riley of Defendant WALMART and requested that someone from its legal department attend an upcoming meeting regarding Relator's refusal to dispense controlled substances based on illegal prescriptions.

121.    On or about August 27, 2012 and August 28, 2012, Relator contacted Mr. Paresh Patel, Health and Wellness Senior Director regarding the illegal controlled substances prescriptions.

122.    On or about August 28, 2012, Defendant WALKER informed Relator that a meeting was scheduled to occur on August 29, 2012, with Doug Henger, Jim Pesta and Jeff Kauffman, RPh.

123.   On or about August 29 2012, Relator met with Doug Henger, Jim Pasta and Jeff Kauffman. During the meeting Messrs. Henger, Pasta and Kauffman stated that based on the information Relator had provided to Defendant WALMART regarding the controlled substances prescriptions, it appeared that these prescriptions were not in compliance with Defendant WALMART's policies.

124.   On or about August 30, 2012, Relator sent an e-mail to Mr. Patel, RPh, stating that several of his concerns, including the controlled substances prescriptions, were not fully addressed at the meeting with Messrs. Henger, Patel and Kauffman on August 29, 2012.

125.   On or about August 29 and 30, 2012, Relator sent e-mails to Defendant WALMART's Global Ethics Office following his contact with the Global Ethics Office on August 24, 2012, regarding the illegal controlled substances prescriptions.

126.   On or about September 5, 2012, Steve from WALMART's Global Ethics Office responded to Relator's August 30, 2012 and August 29, 2012 emails regarding, inter alia, the illegal controlled substances prescriptions.

127.   On or about August 29, 2012, Relator received a call from Ms. Kathy Stove, Director of Assets Protection from Defendant WALMART's home office to discuss his concerns regarding Defendant WALMART's dispensing illegal controlled substances prescriptions.  Ms. Stove asked Relator to forward the information he had regarding his concerns.

128.   On or about August 29 and 30, 2012, Relator sent Ms. Stove an e-mail regarding the illegal controlled substances prescriptions.

129.   Ms. Stove never followed up with Relator regarding the information he supplied to her on or about August 29 and 30, 2012.

130.     On or about August 30, 2012, Relator was working at WALMART store #02869, in Lansing, Michigan.  During his shift, the District Supervisor over this store advised Relator that he had a call from Defendant RODRIGUEZ.  Defendant RODRIGUEZ told Relator that he was to leave the pharmacy and go home, prior to the end of his shift.

131.     On or about August 30, 2012, Defendant RODRIGUEZ told Relator that he was being placed on an administrative leave of absence with pay until the company completed an investigation into his complaints.

132.     On or about August 31, 2012, Defendant HENGER sent Relator an e-mail arranging a meeting for September 4, 2012.

133.     Defendant RODRIGUEZ, Jeff Kauffman and Defendant HENGER asked Relator to meet them at the Caro WALMART store to participate in the investigation into his complaints regarding the illegal controlled substances prescriptions.

134.     On or about September 4, 2012, when Relator arrived at the meeting, Jeff Kauffman presented him with copies of certain controlled substances prescriptions.

135.     On or about September 4, 2012, Relator reviewed these prescriptions and noted that these prescriptions were not verified at the time they were dispensed on or about July and August 2012.

136.     On or about September 4, 2012, during this meeting, Relator learned that Defendant WALKER and Defendant HENGER had directed the Pharmacy Manager Carrie Martindale to alter the prescriptions.  The alterations included new (now correct) phone numbers for the prescribing physicians, in different handwriting and different ink and had verification notes in different handwriting.  However, the original scanned images of these prescriptions, which are stored in the "Connexus" system in Defendant WALMART Pharmacy's software is

different from the hard copy images of the prescriptions that were shown to him at the Defendant WALMART Pharmacy store on September 4, 2012.

137.    On or about September 4, 2012, Relator sent an e-mail to Defendant RODRIGUEZ regarding the meeting he attended on September 4, 2012, stating that the prescriptions he identified for discussion at the meeting had been altered.

138.    On September 4, 2012, Defendant RODRIGUEZ acknowledged receipt of a voicemail, e-mail and copies of the altered prescriptions.

139.    On or about September 5, 2012, Relator sent an e-mail to Defendant RODRIGUEZ in follow-up to their phone call on September 4, 2012 and attached documents reflecting Defendant WALKER's retaliation.

140.    On or about September 9, 2012, Defendant RODRIGUEZ e-mailed Relator requesting to speak with him on September 10, 2012.

141.    On or about September 10, 2012, Relator spoke with Defendant RODRIGUEZ regarding the alteration of the controlled substances prescriptions.

142.    On or about September 10, 2012, following the phone call, Relator sent Defendant RODRIGUEZ an e-mail regarding his ongoing concerns about the illegal controlled substances prescriptions.

143.    On or about September 11, 2012, Defendant RODRIGUEZ e-mailed Relator stating that "we are working to address your root issue of the controlled substances."

144.    On or about September 11, 2012, Defendant RODRIGUEZ also e-mailed Relator stating he had spoken with "Doug [Henger] and we can contact you at 2:15 your time today."

145.    On or about September 12, 2012, Relator sent an e-mail to Defendant RODRIGUEZ with a copy of an e-mail from Defendant WALKER regarding the Caro incident.

146.    On or about September 12, 2012, Relator received an e-mail from Defendant WALMART's Global Ethics department advising him that the investigation surrounding the issue of illegal controlled substances prescriptions was closed, that the outcome of the investigation could not be released to him and that he would be receiving a follow up e-mail from Defendant RODRIGUEZ.

147.    On or about October 1, 2012, Relator sent an e-mail to DEA Officer, James Rafalski Diversion - Detroit DEA (located at 211 W. Fort Street - Suite 610, Detroit, MI 48226) regarding the controlled substances prescriptions.

148.    On or about October 4, 2012, Relator received an e-mail from Defendant RODRIGUEZ regarding a meeting for October 5, 2012.

149.    On or about October 4, 2012, Relator responded by e-mail to Defendant RODRIGUEZ reiterating his ongoing concerns.

150.    On or about October 5, 2012, Relator participated in a phone call with Defendant RODRIGUEZ and Dadrion Gaston, of Defendant WALMART's Regulatory Affairs, and during the call Defendant RODRIGUEZ stated, among other things, that he was investigating Relator's concerns.

151.    On or about October 5, 2012, following the phone call with Defendant RODRIGUEZ and Ms. Gaston, Relator followed up with an e-mail to Ms. Gaston and Defendant RODRIGUEZ regarding his complaints and retaliation.

152.    On or about October 8, 2012, Relator sent another e-mail to Ms. Gaston in advance of a phone conference scheduled to occur that day.

153.    On or about October 10, 2012, Defendant RODRIGUEZ sent an e-mail to Relator and Defendant HENGER in follow-up to their phone calls during the week.   Defendant

RODRIGUEZ's e-mail states that the investigation into Relator's concerns about "the validity of prescriptions that appeared to not have an original signature" was validated.   Defendant RODRIGUEZ states "we did find that the defined practice of filling prescriptions that are received via fax or e-scribe were not being completed properly."

154.    On or about October 10, 2012, Relator was supposed to meet with Defendant HENGER in person and Defendant RODRIGUEZ (by telephone) on October 12, 2012.

155.    On or October 15, 2012, Relator received an e-mail from Defendant RODRIGUEZ stating he needed to have another follow-up meeting with Defendant HENGER before he would be returned to work.

156.    On or October 16, 2012, Relator attended a meeting with Defendant HENGER in person and Defendant RODRIGUEZ by telephone to discuss WALMART's incident reporting policy.   During this meeting, Relator was chastised for allegedly removing copies of illegal prescriptions from the pharmacy and he was told if he did this again he would be fired.

157.    On or about October 16, 2012, Relator sent an e-mail to Defendant RODRIGUEZ following up on the meeting wherein he requested that Defendant RODRIGUEZ provide him with a copy of the incident report of September 14, 2012, so he could respond to it.

158.    Relator received a copy of the incident report but not a copy of the original prescription referenced in the incident report.   However, Defendant RODRIGUEZ told Relator not to respond to it while he was on administrative leave.

159.    Thereafter, Mr. Silva, Divisional Human Resources Sr. Director, contacted Relator and Relator disclosed details of the retaliation against him and the illegal conduct involving the controlled substances prescriptions.

160.    On or about November 9, 2012, Relator met with Mr. Silva and two representatives from Defendant WALMART's Compliance Division, Messrs. Marakis and Mulder.

161.    On or about November 12, 2012, Relator followed up with Messrs. Mulder and Marakis.

162.    On November 15, 2012, Relator participated in a follow-up phone conference with Messrs. Silva, Marakis and Mulder.  Relator also provided a written explanation in response to questions posed to him during his meeting with them on November 9, 2012.

163.    On November 19, 2012, Relator sent additional information to Messrs. Silva, Marakis and Mulder.  Mr. Silva acknowledged receipt of the additional information.

164.    On November 21, 2012, Relator sent an e-mail to Messrs. Mulder, Marakis and Silva regarding the August 9, 2012 Caro, Michigan incident.

165.    Relator received no response from Mr. Silva, Mr. Mulder or Mr. Marakis to his e-mails of November 2012.

166.    On January 21, 2013, WALMART terminated Relator in retaliation for his complaints regarding illegal controlled substances prescriptions.

### COUNT I-FALSE CLAIMS ACT-PRESENTATION OF FALSE CLAIMS

167.    Relator incorporates by reference Paragraphs 1 through 166 of this Complaint.

168.    Defendants knowingly presented or caused to be presented, to (a) the United States and State of Michigan governments or (b) others possessing money or property to be spent or used on the governments' behalf or to advance a government program or interest, false or fraudulent claims for payment or approval, which claims were false or fraudulent by virtue of Defendants' violation of the Medicare and Medicaid statutes and regulations and the Civil

Monetary Penalties Law ("CMPL") contrary to Defendants' certification, or implied certification, to the United States and State of Michigan governments that Defendants were in compliance with the Medicare and Medicaid laws, the CMPL, and other federal and state health care laws, thereby violation the False Claims Acts, FERA and the Michigan Medicaid False Claims Act.

169. As depicted in the General Allegations, paragraphs 43 to 166, *supra*, Defendants used and/or submitted false statements, records, or claims in obtaining payments from the federal and state governments based upon: a) false billing for adulterated drugs; b) false billing for misbranded drugs; c) billing for fictitious patients; and d) providing illegal remuneration in the form of free syringes of medication, resulting in the payment of funds from Medicare, Medicaid and other governmental health programs.

170. The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on, approved, or funded the payment or approval of the false or fraudulent claims, which resulted in damages to the United States and the State of Michigan.

## <u>COUNT II-FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT</u>

171. Relator incorporates by reference Paragraphs 1 through 170 of this Complaint.

172. Defendants knowingly made, used, or caused to be made or used, false records or statements

    (a) material to a false or fraudulent claim

        (i) presented to an officer, employee, or agent of the United States or

        (ii) against money or property to be spent or used on the government's behalf or to advance a government program or interest or

(b) to get a false or fraudulent claim paid or approved by the United States and State of Michigan governments, which claims were false or fraudulent by virtue of Defendants violation of the federal and state laws and regulations governing Medicare, Medicaid and the CMPL contrary to Defendants' certification, or implied certification, to the United States and State of Michigan governments that Defendants were in compliance with the Medicare Medicaid laws, the CMPL, and other federal and state health care laws, thereby violating the False Claims Act, FERA and the Michigan Medicaid False Claims Act.

173.    As depicted in the General Allegations, paragraphs 43 to 166, *supra*, Defendants used and/or submitted false statements, records or claims in obtaining payments from the federal and state governments based upon submission of false claims for payment of funds from Medicare, Medicaid and other governmental health programs.

174.    The United States and the State of Michigan governments were unaware of Defendants' improper and illegal conduct and made full payment on, approved, or funded the payment or approval of the false or fraudulent claims, which resulted in damages to the United States and the State of Michigan.

## COUNT III- FALSE CLAIMS ACT – CONSPIRACY

175.    Relator incorporates by reference Paragraphs 1 through 174 of this Complaint.

176.    Defendants together with their employees and other persons or entities known or unknown, conspired to defraud the United States and the State of Michigan governments by agreeing to present to the United States and State of Michigan governments false or fraudulent claims for payment or approval, as detailed in paragraphs 43 through 166 above, which claims were false or fraudulent by virtue of Defendants' acting as co-conspirators falsely bill for

illegally prescribed controlled substances in violation of Defendants' simultaneous certification, or implied certification, to the United States and State of Michigan, that they were in compliance with the Medicare, Medicaid laws, the CMPL, and other federal and state health care laws.  See 31 U.S.C. § 3729(a)(3).

177.    The United States and State of Michigan governments were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined to the United States and State of Michigan.

**COUNT IV**
**VIOLATIONS THE CIVIL MONETARY PENALTIES LAW**

178.    Relator incorporates by reference Paragraphs 1 through 177 of this Complaint.

179.    The provisions of 42 U.S.C. § 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL"), provide in relevant part as follows:  (a) Improperly filed claims any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that

> (1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(l ) of this section)….

> > (B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent…..

> (7) commits an act described in paragraph (1) or (2) of section 1320a-7b(b) of this title;

> > Shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited

relationship occurs; or in cases under paragraph (7), $50,000 for each such act).  In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose). In addition, the Secretary may make a determination in the same proceeding to exclude the person from participation in the Federal health care programs (as defined in section 1320a-7b(f)(l) of this title) and to direct the appropriate State agency to exclude the person from participation in any State health care program.

180.   In short, an individual or entity, excluding a federal health care program beneficiary, is subject to the penalties and assessments of the CMPL and to exclusion from participation in any federal health care program when that individual or entity knowingly presents or causes to be presented to the United States government a claim for an item or service and the person knows or should know the claim is false or fraudulent.

181.   Defendants are also liable under the CMPL for actions of its agent-employees committed within the scope of the agency or employment.  42. U.S.C. § 1320a-7a(l).

182.   As required by law, Defendants expressly certified to the government that Defendants were in compliance with all federal health care law, which includes the CMPL, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

183.   Defendants also implicitly certified to the government that Defendants were in compliance with all federal health care law, which includes the CMPL, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care

programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

184.    As set forth in the preceding paragraphs, including the General Allegations, at paragraphs 43 to 166, *supra,* Defendants filled illegal controlled substance prescriptions.

185.    Defendants claimed reimbursement from Medicare, Medicaid, and other federal and state health care programs in the full amount of the goods, services, or items provided while contemporaneously certifying, both explicitly and implicitly, that Defendants were in compliance with all federal and state health care laws, the CMPL.

186.    Defendants performed the above illegal and improper acts and also directed its agents and employees to commit the same illegal and improper acts in the course of, and within the scope of, their employment.

187.    If the United States and State of Michigan governments had been aware of Defendants' improper and illegal conduct, including the false certifications, the government would not have made payment on or approved Defendants' claims for reimbursement under Medicare, Medicaid, and other federal or state health care programs.

188.    By agreement and by law, Defendants were required to comply with all federal health care law, which includes the CMPL, and the rules and regulations of Medicare, Medicaid, and the United States Department of Health and Human Services.

189.    Defendants acted with actual knowledge, deliberate ignorance, and/or reckless disregard in submitting false or fraudulent claims to the government and in filling illegal prescriptions as an inducement to keep customers and increase revenue.

190.    As a result of Defendants' false and fraudulent certifications and claims for reimbursement, Defendants violated the False Claims Act, the Michigan Medicaid False Claims Act and caused the United States government to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Relator on behalf of himself and of the United States and the State of Michigan requests judgment as follows:

A.    The United States and the State of Michigan are entitled to reimbursement of the funds plus three (3) times the damages sustained by the United States as a result of the false or fraudulent claims obtained by Defendants as a result of fraudulent claims submitted to the United States and the State of Michigan.

B.    The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation for each false or fraudulent claim.

C.    The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL.

D.    The United States is entitled to exclude Defendants from participation in any federal health care program.  See 42 U.S.C. § 1320a-7(b)(7).

E.    Relators are entitled to reasonable attorneys' fees and costs.  See 31 U.S.C. § 3730(d).

F.    Relators are entitled to an order of partial distribution of damages, penalties, assessments, and other relief awarded to the United States in an amount equivalent to a percentage of the entire recovery as set forth in 31 U.S.C. § 3730(d); such percentage distribution is in addition to Relator's recovery of expenses, attorneys' fees, and costs.

Respectfully submitted,

HERTZ SCHRAM PC

By:    /s/ Patricia A. Stamler
        Patricia A. Stamler (P35905)
        Attorney for Plaintiff-Relator
        1760 S. Telegraph Road, Suite 300
        Bloomfield Hills, MI 48302-0183
        (248) 335-5000

## DEMAND FOR TRIAL BY JURY

NOW COMES Relator Ashwani Sheoran, on behalf of himself, the Untied States of America and the State of Michigan, by and through his attorneys, HERTZ SCHRAM PC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

HERTZ SCHRAM PC

By:    /s/ Patricia A. Stamler
        Patricia A. Stamler (P35905)
        Attorney for Plaintiff-Relator
        1760 S. Telegraph Road, Suite 300
        Bloomfield Hills, MI 48302-0183
        (248) 335-5000

Dated: February 11, 2013

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA and
STATE OF MICHIGAN, ex rel,
ASHWANI SHEORAN, RPh,

      Plaintiff-Relator,

                                  Case No. 13-10568

-vs-                           Hon. John Corbett O'Meara
                                  Magistrate Judge Michael Hluchaniuk

WAL-MART STORES EAST, LP, d/b/a
WALMART, a foreign corporation,      **MATTER FILED IN CAMERA**
TOI WALKER, DOUG HENGER,        **AND UNDER SEAL**
ALFRED RODRIGUEZ,
RICHARD LOCKARD, M.D.,
NAVEED MAHFOOZ, M.D., and
TAREK EZZEDDINE, M.D.,
Jointly and Severally,

      Defendants.
_____/

HERTZ SCHRAM PC
By:    Patricia A. Stamler (P35905)
Attorney for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302-0183
(248) 335-5000
_____/

## PROOF OF SERVICE

      The undersigned certifies that on February 11, 2013, she served the following:

- Complaint; and
- Proof of Service

upon:

      Eric H. Holder, Jr.               Bill Schuette
      U.S. Attorney General         Michigan Attorney General
      U.S. Department of Justice     Michigan Dept. of Attorney General
      950 Pennsylvania Avenue, NW  P.O. Box 30212
      Washington, DC  20530-0001   525 W. Ottawa Street
                                    Lansing, MI  48909-0212

| | |
|---|---|
| Peter Caplan | Elizabeth Valentine |
| Assistant U.S. Attorney | Assistant Attorney General |
| U.S. Attorney's Office | State of Michigan |
| 211 W. Fort Street, Suite 2001 | Health Care Fraud Division |
| Detroit, MI  48226 | 2860 Eyde Parkway |
| | East Lansing, MI  48823 |

via certified mail, return receipt requested.

*I declare that this Proof of Service has been examined by me and that the contents are true to the best of my information, knowledge and belief.*

 /s/ Shannon Shaw
_____